Filed 6/25/25  In re J.A. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. V.A. et al., Defendants and Appellants. | G064724 (Super. Ct. Nos. 21DP0781, 21DP0781A, 21DP0782, 21DP0782A) ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ORDERED that the opinion filed on May 27, 2025, be modified as follows:

On page 22, second paragraph, add as footnote 4, at the end of the following sentence: "Unless circumstances have materially changed, the court should order guardianship as the permanent plan." The footnote shall read:

"In a petition for rehearing, SSA argued that our opinion takes for granted that guardianship is an available option for the twins. Our review of the record indicates that it is. If, however, it turns out not to be, this would qualify as a material change of circumstances. [4]"

The opinion is otherwise unchanged.

The petition for rehearing is DENIED.

The modification does not change the judgment.

SANCHEZ, ACTING P. J.

WE CONCUR:


DELANEY, J.


SCOTT, J.

Filed 5/29/25  In re J.A. CA4/3 (first modification)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>V.A. et al.,<br><br>    Defendants and Appellants. | G064724<br><br>(Super. Ct. Nos. 21DP0781, 21DP0781A, 21DP0782, 21DP0782A)<br><br>ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed May 27, 2025, be modified as follows:

The caption is MODIFIED to reflect that the correct superior court case numbers are 21DP0781, 21DP0781A, 21DP0782, 21DP0782A.

There is no change in the judgment.

SANCHEZ, ACTING P. J.

WE CONCUR:


DELANEY, J.


SCOTT, J.

Filed 5/27/25 In re J.A. CA4/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.A. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>V.A. et al.,<br><br>    Defendants and Appellants. | G064724<br><br>(Super. Ct. Nos. 21DP0781A, 21DP0782A)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Julie Anne Swain, Judge. Reversed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant father V.A.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant mother V.A.

Leon J. Page, County Counsel, and Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

\*　　　\*　　　\*

V.A. (Father) and V.A. (Mother) have appealed from an order made pursuant to Welfare and Institutions Code section 366.26 (section 366.26) that terminated their parental rights regarding their twin daughters, J.A. and V.A. They contend the order was in error because two exceptions applied: the parental-benefit exception, and the sibling exception. They also contend the court erred in finding that the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) does not apply.

The principal issue in this appeal is the parental-benefit exception. The parents contend the exception applies because their visitation was extensive, consistent, and positive, and the children were old enough to voice their love for their parents and indicated their desire to not be separated from them. They contend the evidence pointed in only one direction—that the minors would be harmed by terminating parental rights—and that the court erred in not choosing guardianship as the permanent plan. We agree and will reverse the judgment.

FACTS

I.

DETENTION, JURISDICTION, AND DISPOSITION

In July 2021, deputies of the Orange County Sheriff's Department were dispatched to Mother's residence to evict her. When they arrived, they were greeted by her oldest child, D.V., who informed them that Mother was not home. D.V. (age 11) was watching two younger siblings, A.V. (age 8) and J.A. (age 1, who, along with her twin sister, V.A., are the subjects of this appeal). Deputies observed the residence to be disheveled and

2

unsanitary, including dog feces and dirty diapers on the floor; expired food in the fridge; and, throughout the residence, clutter, trash, and leftover food.

About two hours later, Mother returned with her other two children, E.V. (age 9) and V.A. Mother explained that she had been moving her possessions out, and she could not fit all five children in her vehicle. Social workers interviewed Mother and the older children, all of whom reported that their basic needs were being met, and in the home there was no domestic violence, substance abuse, nor sexual abuse. The children reported that the residence was not usually so filthy, but that it was so now because they were in the process of moving out. They also reported that Mother does not generally leave them home alone. The child V.A. had a scabbed-over burn mark on her chest, which reportedly occurred when the child reached for a portable stove that was being used for cooking while Mother was in the bathroom.

The officers present did not arrest Mother but cited her for child endangerment based on the filthy living conditions. The children were detained and taken to Orangewood Children and Family Center where it was observed that all five had lice. The children were subsequently placed with family members.

At the time of the eviction, Father (who is husband to Mother, but father to only J.A. and V.A.) had been in jail for about a month due to a probation violation. Father had a criminal history that included forgery (2012), receiving stolen property (2013), possession of a controlled substance with intent to sell (2017, 2019), identity theft (2020), and various drug offenses. He would ultimately be released approximately two weeks later.

The court ordered the children temporarily detained on July 20, 2021. The twins were placed with their paternal second cousin, Crystal C.,

where they would remain for the duration of these proceedings. Their three older half siblings were placed with other relatives.

Mother was given 12 hours per week of supervised visitation. From the outset, the twins' caregiver reported that they would "have a meltdown" for about five minutes when Mother left a visitation.

Among the various services Mother was initially referred to was random drug testing. Mother tested positive for methamphetamine on August 11, 13, and 14. Father was also referred to random drug testing, but he no-showed on August 12, 17, and 24.

On August 27, 2021, Father was arrested for acts of domestic violence against Mother and was sent back to jail. According to a police report, Mother had visible marks on her when interviewed by police. Mother and Father both denied any physical altercation had occurred. Father was found with a drug pipe in his possession, and he admitted to relapsing on methamphetamine.

The jurisdiction hearing was held on October 6, 2021, at which the court found the allegations of an interlineated petition to be true. The petition generally alleged that Mother had failed to provide a safe and sanitary home environment, and Father has an unresolved substance abuse problem. The court removed custody from the parents and approved a case plan of family reunification services.

## II.

### FIRST REUNIFICATION PERIOD

Mother's case plan called for her to participate in parenting education, general counseling, substance abuse testing, and a substance abuse outpatient program.

Mother completed a parenting class in September 2021.

4

Mother participated in individual counseling, which, according to the counselor and Mother, was going well. The counselor reported observing positive growth and progress.

As for substance abuse testing, Mother was a no-show for several tests in November and December of 2021. Mother had a drug patch applied in January of 2022, and it came back positive for methamphetamine and cocaine. She also tested positive for cocaine in late January and early February 2022. However, from March through June, Mother was present for all tests, and all were negative.

Mother began an outpatient substance abuse program in January 2022. She provided proof of completion of her program in June 2022.

Mother's case plan compliance for the first period was deemed moderate.

Father was incarcerated for much of the first reunification period. His case plan called for parenting education, general counseling, substance abuse testing, and substance abuse treatment. Father participated in counseling but otherwise did not engage further services due to his incarceration.

Father's case plan compliance was deemed to be none.

With regard to Mother's visitation, the social worker provided the following summary: "During the past period of supervision, the mother has maintained a relationship with the children through supervised [visits]; however, it has also been common for the mother to cancel and/or refuse visits. When the mother attends visits with the children, the mother is attentive to the children's needs, and they engage among each other in play, sharing meals, and positive interaction. The visits have been reported to be appropriate while the children engage in board games and tablet activities

5

with the mother. The family has been observed to share laughs while snacking on the snacks provided by the mother. During the visits the children and the mother watch movies, conversate and read books to each other. The [half-brothers] have reported that they enjoy spending time with their twin sisters during their visits." One concern raised was that Mother was consistently feeding the young twins unhealthy snacks, leading to diarrhea and vomiting.

Orange County Social Services Agency's (SSA) initial six-month status review report contained an unusual discrepancy: on the first page the "Summary Recommendation" stated "Terminate reunification services . . . schedule . . . Selection and Implementation hearing." However, in the "Assessment/Evaluation" section, it stated, "Based on the aforementioned information, the Social Services Agency respectfully requests additional Family Reunification services for the parents. Further, it is respectfully recommended that the Court continue dependency and that a Twelve-Month Review Hearing be scheduled." But then in the "Recommendation" section, it stated, "It is further recommended . . . that reunification services to the parents be terminated, and the matter be scheduled for a Permanency hearing pursuant to Section 366.26 . . . ." A little over a month later, still prior to the review hearing, SSA "changed" its recommendation in an addendum report to "[c]ontinue reunification services . . . schedule Twelve-Month Permanency Review hearing."

The six-month review hearing was continued multiple times and eventually became a combined six- and 12-month review hearing, scheduled for August 2022.

III.

SECOND REUNIFICATION PERIOD

In its 12-month status review report, SSA determined that reunification was likely and recommended continuing services and scheduling an 18-month review hearing.

Following Father's release from jail in May 2022, through August 2022, there were no further criminal charges, both parents were receiving regular income, and they had stable housing that was assessed to be safe.

In August 2022, Mother attended a doctor visit for the twins to address issues of vomiting and diarrhea.

Two days later, Mother gave birth to her sixth child.

For the 12-month review hearing, SSA deemed both Mother's and Father's compliance with their case plans to be moderate.

Mother continued to test sober through August 2022.

Father completed a parenting education course in June 2022. Father was participating in individual counseling. He completed an anger management course and substance abuse treatment while incarcerated. Between June and August 2022, Father consistently tested negative on random drug tests.

Mother continued visiting consistently, the visits were positive, and no new concerns were noted. After Mother fed V.A. a meal at one visit (which had been approved in advance), V.A. returned to the caretaker and once again began vomiting. This resulted in another doctor visit, which Mother attended. Although the twins' caregiver suggested that Mother was

7

feeding them unhealthy food, the foods and portions were screened by Olive Crest Visitation supervisors who verified that they were appropriate.[1]

After his release from jail, Father consistently attended his allotted four hours of weekly visitation concurrent with one of Mother's visits. The visits were appropriate, with the only comment being that the Olive Crest Visitation supervisors would like to see Father take the lead more often on parenting activities, which were mostly being performed by Mother.

At the 12-month review hearing, the court found that both Mother and Father had made substantial progress toward mitigating the causes necessitating placement. The court ordered an 18-month review hearing and approved a case plan that continued reunification services. The court also permitted unsupervised visits to commence.

## III.

### THE THIRD REUNIFICATION PERIOD

Almost immediately, a portion of the parents' visitation was liberalized to unsupervised. On October 21, 2022, this progressed to a 60-day in-home trial visit where the twins moved back in with their parents. In a status review report filed in advance of the January 10, 2023, hearing, the social worker observed, "Throughout the 60-day trial visit, the parents have met the children, [J.A. and V.A.'s] basic needs and maintained medical and dental appointments up to date, additionally following up with medical referrals as needed. During the monthly compliance contacts, the children have presented to be well and free from marks/bruises indicative of abuse.

---

[1] Later, the social worker would observe, "It is also noted that throughout this dependency case, the caregiver of the children [J.A. and V.A.] has continuously reported concerns of which have not been substantiated."

8

The children have been observed comfortable and happy in the home and there has been no suspicion of abuse and/or neglect to the children." The older children reported that, during unsupervised visits, the parents sometimes yelled and cussed at each other, but this concern did not warrant ending the 60-day visit.

SSA deemed the case plan progress of both Mother and Father to be substantial. Mother had 90 days of consistent negative drug tests on the patch, which enabled her to transition to random drug testing instead of a patch. Father continued with individual counseling, and his counselor reported the sessions had been successful, with Father improving his skills in communication, problem solving, coping, and overall parenting. Father's drug tests were mostly negative, though on November 9 and 11, 2022, he tested positive for opiates. The lab reported there was some possibility this was a false positive due to cold medication Father had taken, though unlikely. He tested negative thereafter through the reporting period.

At the conclusion of its report filed for the January 10, 2023, hearing, SSA requested a 60-day continuance. This was to address lingering concerns about the parents cussing and yelling in front of the children, and to ensure Father remained sober. The court granted the continuance.

During the following 60 days, SSA continued to conduct unannounced compliance visits at the parents' home. No safety concerns were identified. The twins (and now also D.V., who began his own 60-day trial visit) were observed to be "clean, well-groomed and free from marks/bruises indicative of abuse. The children have presented happy and comfortable in the home."

During this period, mother attended all her random drug tests, all of which were negative. It was the same for Father: 100 percent compliance, all negative.

During this period, E.V. began unsupervised visitation with Mother and Father (his stepfather), which went well. A.V. continued to refuse visitation, explaining, with tears in his eyes, that he feared not being able to see his caregivers anymore.

As of SSA's addendum report for the March 9, 2023, hearing, SSA recommended returning custody of the twins to their parents (and also custody of their brothers to their mother). The court agreed, finding foster care was no longer necessary or appropriate. The court ordered the twins returned to their parents as the permanent plan. However, it found that continued supervision was necessary and ordered a six-month review hearing.

About three months later, it all unraveled.

IV.

THE CHILDREN ARE REMOVED AGAIN; PARENTAL RIGHTS ARE TERMINATED

On May 23, 2023, Father tested positive for methamphetamine. Between then and early July, he refused multiple "on-demand" tests, contending he was working as a tow truck driver out of the county and unable to test. Starting May 30, 2023, Mother became inconsistent with her drug tests, citing various medical reasons (including Covid-19, which she provided a positive test for, and a viral infection resulting in a fever of 103 degrees, which was verified with a doctor's note). The biggest concern was a test deemed refused on July 5, 2023. The test administrator observed what appeared to be Mother attempting to manipulate the test with a balloon full of liquid.

10

Despite these issues occurring behind the scenes, the children reported that everything was going fine in the home. They did not have any concerns.

On July 7, 2023, the court signed an emergency protective custody warrant. Social workers arrived at the residence together with police officers. The social workers explained the reason for the removal to mother: "inconsistency in her drug tests, the incident at the testing site on July 5, 2023, the father's positive drug test result on May 23, 2023, as well as the neglect of the children's medical and dental care." (The medical care referred to overdue well-child checkups, and E.V. had an unspecified tooth issue that required dental treatment, though E.V. said he "likes how it looks" and was apparently in no pain.)

Mother stepped out of the house, told the children to call their dad, saying, "they are going to take you away," and shut the door behind her. She initially refused to let the social workers and officers in, sitting in the doorway to block their path. One of the children opened the door to hand Mother her phone, at which point the twins both clung to Mother's back and neck. E.V. and A.V. were crying while standing near mother; D.V. was nearby punching the wall. Eventually, Mother relented and helped the children pack their belongings. The children were returned to their previous caregivers.

SSA filed a supplemental dependency petition. The petition alleged that Mother and Father had ongoing substance abuse problems.

At the new detention hearing, the court ordered SSA to provide reunification services and authorized visitation of 12 hours per week for Mother and eight hours per week for Father. At the same hearing, E.V. disclosed that, in connection with her manipulated drug test, Mother had asked him to provide urine for her.

11

In anticipation of the August 14, 2023, jurisdiction/disposition hearing, SSA filed a report on August 7, 2023, in which it recommended that Mother be given reunification services, but not Father.

Mother tested positive for amphetamine and methamphetamine on July 21, 2023. She was a no-show at two subsequent tests. Father tested positive on July 27. Additionally, the brothers reported that incidents of domestic violence had been occurring in the home, including Father pushing Mother to the floor, the two hitting each other, and arguing. They reported that mother sometimes yelled at the children, threw things at them, and even broke a bedroom door running after E.V. There were times when Mother refused to feed the children because she was mad at Father. Further, they reported Mother and Father would sometimes spend hours together in the garage, leaving D.V. to care for and feed the other children. Since being returned to the parents' care, the children had as many as 18 unexcused absences from school.

After the removal, Mother and Father consistently visited the children.

SSA filed an addendum report prior to the August 21, 2023, hearing in which it changed its recommendation to no reunification services for either parent.

It was subsequently reported that Mother had no-showed or failed to produce a specimen for four of her five required tests in August and September 2023. It was later reported she continued to fail testing in late September and October. Father tested positive for methamphetamine on August 8, 2023.

On October 17, 2023, Father was arrested on felony charges of second degree vehicle burglary. It was alleged that he broke into a locked

12

vehicle with the intent to commit larceny. He was also charged with felony counts of being a felon in possession of ammunition and possession of fentanyl and methamphetamine for sale, and a misdemeanor count of vandalism.

For all that, Mother continued to consistently attend her visits with the children, and the visits were going well.

At the jurisdictional hearing, the court found the petition to be true, and it found that reunification services need not be provided. The court scheduled a permanency hearing pursuant to section 366.26 (.26 hearing). The court also accepted the negotiated settlement reached by Mother, Father, and SSA. SSA agreed to provide funding for services through the date of the .26 hearing. Mother and Father agreed to continue drug testing, with the condition that any positive or missed test would nullify SSA's obligations under the agreement.

In the runup to the .26 hearing, Mother continued visiting her children consistently, missing hardly any visits, and the visits were reported to be enjoyable and free of any significant concerns. In January 2024, the social worker observed a visit between Mother and her children. "The children all appeared happy to visit with the mother as they all smiled and laughed throughout the visit. The younger children were observed to hug the mother. [V.A.] spent time sitting on mother's lap and close by her side."

During that same period, mother continued drug testing, resulting in 12 negative tests, two refused tests (unable to provide a urine sample), and seven missed tests. Father had two negative tests, 15 missed tests, and one test positive for cannabinoids.

Leading up to the .26 hearing, SSA also took steps to remove the twins from their caregiver, Crystal, to potentially be placed with a maternal

13

aunt in New Hampshire. In October 2023, the social worker reported on a concern about the number of children in Crystal's home: "The undersigned would like to formally notify the Court that there is concern as to placement for the [twins and their infant brother]. It has come to the attention of the Agency that the caregiver for the [twins and their infant brother] has a total of ten children in her care; four biological children, three other children who are Dependents, and the [twins and their infant brother]. The Agency is currently working and addressing the concern as to the number of children in her care." In a February 2024 report, a social worker noted: "Presently, the [twins] share a bedroom with the other four dependent children, (3 males and 1 female) who range in age between a 1 year old and 12-year-old." A month later, Crystal added an additional bedroom to her home so that the twins and their infant brother had their own room.

After multiple continuances, the .26 hearing finally took place beginning August 12, 2024.

The parties stipulated that if called to testify, J.A. would testify as follows: "She said she misses her parents and wants to go home with them. She likes to see them." "It makes her feel bad when she has to leave them [after visits] because she misses them." "She said it's good with Crystal, but she misses her parents and wants to live with them." She wished she could live with her parents and wished she had more visitation with them. When asked whether she loves her parents, J.A. replied, "[T]o love something is with all your heart" and said she "feels that way about mommy and daddy." She said she does not want to be adopted. If she never saw her parents again, she would be "sad and would miss them so much." V.A. offered similar stipulated testimony.

14

Consistent with their testimony, both Mother and D.V. testified that the twins would become emotional at the end of visits, not wanting to leave.

The social worker, upon questioning from the court, testified that the twins would benefit by continuing their contact with their parents. The social worker also testified that it would have been beneficial to have a consortium referral, but acknowledged that it never happened.[2] The referral would have been beneficial so that visitation between the twins and their parents could have been set. Unofficially, the social worker had discussed the matter with Crystal, who expressed willingness to facilitate postadoption visitation with Mother and Father. However, the social worker also acknowledged, as is evident from the record, that Mother and Crystal do not get along.

In the end, however, the court found the twins to be adoptable, terminated parental rights, and ordered adoption as the permanent plan. With regard to the parental-benefit and sibling relationship exception, the court simply stated: "Parents have not met their burden as to either of those exceptions, so the Court finds those exceptions do not apply." The court did not explain its reasoning or make any specific factual findings in support of its ruling.

Both parents appealed.

_____

[2] A consortium referral is a referral to Consortium for Children, which helps create and implement postpermanency plans for continued contact between minors and biological family members. (See Cal. Dept. of Social Services, All County Information Notice No. I-45-04 (June 30, 2004) p. 8 <https://www.cdss.ca.gov/lettersnotices/entres/getinfo/acin04/pdf/I-45_04.pdf> [as of May 27, 2025], archived at <https://perma.cc/9ULV-DSGQ>.)

15

## DISCUSSION

The principal issue raised by the parents is that the evidence compelled a finding that the parental-benefit exception to adoption applied. Although such an argument is an uphill battle given the deferential standard of review we must apply, we are convinced they are correct.

Section 366.26 governs the procedures applicable once the efforts to reunify the parent and child have failed. The goal at the .26 hearing is "'to select and implement a permanent plan for the child.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) Section 366.26, subdivision (b) sets forth the available options for a permanent plan "in . . . order of preference." The first, and thus most highly preferred option, is to terminate parental rights and order that the child be placed for adoption. (§ 366.26, subd. (b)(1).) "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The other options, in order of preference, are to appoint a legal guardian for the child, to place the child with a fit and willing relative, or to place the child in long-term foster care. (§ 366.26, subd. (b)(5)–(7); *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

In selecting a permanent plan, "the court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).) As we have previously explained, '[t]he

16

statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C., supra*, 11 Cal.5th at pp. 630–631.)

The relevant exception to adoption here is the parental-benefit exception. To find that this exception applies, the court must find "a compelling reason for determining that termination would be detrimental to the child due to . . . the following circumstance[ ]: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at p. 631.) In deciding whether termination of parental rights would be detrimental, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Id.* at p. 632.) "Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be

17

'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.)

"A hybrid standard governs our review. [Citation.] The first two elements involve factual determinations to which the substantial evidence standard of review applies. [Citation.] The final step, determining whether termination of parental rights would be detrimental to the child, is reviewed for abuse of discretion." (*In re G.H.* (2022) 84 Cal.App.5th 15, 26.)

Here, there is no dispute about the first element. Mother consistently visited her children; indeed, she was *extremely* consistent. And having 12 to 15 hours per week of visitation, plus holidays and birthdays, meant this was a significant commitment of time every week, which she fulfilled almost without fail. Father was also highly consistent when he was out of custody.

With regard to the second element, although SSA argues on appeal that continuing the parental relationship would not benefit the child, the evidence at trial was largely undisputed. While the assigned social worker was on the stand, the court asked her point blank: "Is it your opinion that [V.A.] and [J.A.] would benefit by continuing visitation or contact with the parents?" Answer: "Yes."

What this case really comes down to is the third element of the *Caden C.* test: whether the balance of harms favors adoption. As *Caden C.* counsels, we will assume that, if adopted, J.A. and V.A. would be completely cut off from their biological parents. The court was called upon to decide whether this severing would "outweigh[ ] the benefit to the child of placement in a new adoptive home." (*Caden C., supra,* 11 Cal.5th at p. 632.)

Because each case is fact specific, the *Caden C.* framework does not specify precisely what alternatives the court must weigh. It tells us to

18

assess whether the benefit of a permanent adoptive home outweighs the harm of severing the parent-child relationship—but compared to what permanency plan for the children? Here, the parties presented only two options: adoption or guardianship. Accordingly, the question before the court was to what extent adoption offers a meaningful advantage over guardianship, and whether that advantage justifies the complete termination of J.A. and V.A.'s legal and personal connection to their parents.

We begin with the comparative advantage of adoption over guardianship. Fortunately, this is a topic that has been rigorously studied in the social sciences. In one study commissioned by the State of Illinois, only 3.5 percent of children subject to a guardianship exited the guardianship prematurely. (Testa et al., Illinois Subsidized Guardianship Waiver Demonstration, Final Evaluation Report (2003) p. 3 <https://cfrc.illinois.edu/pubs/rp_20030701_IllinoisSubsidizedGuardianshipWaiverDemonstrationFinalEvaluationReport.pdf> [as of May 23, 2025], archived at <https://perma.cc/GMR8-BQW4>.) In another study that specifically compared guardianship to adoption, incidences of discontinuity were 11 percent in guardianships versus 6 percent in adoptions. (Rolock & White, *Continuity for Children After Guardianship Versus Adoption with Kin: Approximating the Right Counterfactual* (2017) 72 Child Abuse & Neglect 32.) In another study analyzing data collected by four different states, one researcher summarized the results of choosing guardianship over adoption as: "there is no evidence of any adverse impact on the long-term stability of the living arrangement." (Testa, Subsidized Guardianship: Testing the Effectiveness of an Idea Whose Time Has Finally Come (2008) p. 25 <https://spaulding.org/wp-content/uploads/archive-pdf/Subsidized-Guardianship-Testing-Effectiveness-Testa-2008.pdf> [as of May 27, 2025],

19

archived at <https://perma.cc/9ZNZ-V4GK>.) Similarly, a synthesis of several state studies prepared for the Federal government found that children in a guardianship relationship "experienced comparable rates of placement stability as children in other placement arrangements." (Admin. for Children and Families, Admin. on Children, Youth and Families, Children's Bureau, U.S. Dep't Health & Human Services, Synthesis of Findings: Subsidized Guardianship Child Welfare Waiver Demonstrations (2011) p. 18 <https://acf.gov/sites/default/files/documents/cb/subsidized.pdf> [as of May 27, 2025], archived at <https://perma.cc/RH4B-Z3CX>.) However, as pointed out by retired Judge Leonard Edwards, a noted subject matter expert, there are advantages to adoption beyond permanency, such as that the legal relationship persists beyond age 18 and enables the adoptee to inherit from the adoptive parents. (Judge Leonard Edwards (ret.), *Comments on "Confronting Indeterminacy and Bias in Child Protection Law" by Josh Gupta-Kagan*, 33 Stan. L. & Pol'y Rev. Online (2022) p. 5.) What emerges from the literature is that there is some advantage to adoption over kinship guardianship, but the advantage is modest.[3]

In citing this data, we emphasize that we are not seeking to displace the Legislature's stated preference for adoption, which we have neither the authority nor the desire to do. However, because the Legislature has codified exceptions to the adoption preference, courts must engage in a comparative analysis—and in doing so, we believe it is appropriate to consider relevant and broadly accepted research findings.

---

[3] Most of the studies on guardianship involved kinship guardianship (i.e. guardianship by a relative). Since the two potential guardians in this case are both kin of the minors, these studies are relevant and applicable. There is less data available on non-kinship guardianship.

Next, we must assess the harm that would ensue to J.A. and V.A. if their relationship with their parents were completely severed. On this issue, the evidence pointed consistently toward harm. The twins, who were five years old at the time of the hearing, both testified that they love their parents dearly and did not want to lose them. Both twins referred to their biological parents as "Mom" and "Dad," not their caretakers. The reports from observers of visitation consistently noted the loving interaction between the parents and children. The twins spent significant amounts of time with the parents (especially Mother). Mother visited between 12 and 15 hours per week (which, when one considers work and school schedules, is a significant fraction of one's free time). And the twins lived with the parents for five months when they transitioned to Family Maintenance. The evidence showed that the twins were consistently sad when having to leave visitation. When they were taken from Mother's care, there was the tragic scene of the twins clinging to Mother's neck and back. SSA ultimately found it *would* be detrimental to sever the parental relationship with the twins' half siblings E.V. and D.V. And the social worker testified that the twins would benefit by continuing their relationship with their parents.

When we conclude that the parental-benefit exception does *not* apply, we often characterize the evidence as showing the biological parents filled the role of "'friendly visitor'" or friendly aunt, or that they enjoyed merely "'pleasant visits.'" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 319; *In re J.C.* (2014) 226 Cal.App.4th 503, 529; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) There is no way to characterize the evidence that way in this case. Mother and Father are the twins' parents, both biologically and relationally. There is a loving, committed relationship between the twins and their parents.

21

Completely severing that relationship would undoubtedly harm the twins. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 300–301 ["The record shows S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]."].)

In light of the modest benefits to be gained through adoption over guardianship in this case, and also the evidence of harm that would ensue from terminating the parental relationship, it was an abuse of discretion to weigh those factors in favor of adoption. Accordingly, we will reverse the judgment selecting adoption as the permanent plan. On remand, the court should conduct a new .26 hearing. Unless circumstances have materially changed, the court should order guardianship as the permanent plan.

Because we conclude the parental-benefit to adoption applies, we need not address the parents' argument concerning whether the sibling relationship exception required guardianship. Nor need we address ICWA issues, which can be addressed below on remand.

## DISPOSITION

The judgment is reversed.

SANCHEZ, ACTING P. J.

WE CONCUR:

DELANEY, J.

SCOTT, J.